United States District Court
Southern District of Texas
**ENTERED**
January 03, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KENNETH E. DAVIS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CASE NO. 4:17-CV-521 |
| NANCY A. BERRYHILL, Acting | § | |
| Commissioner of the Social Security | § | |
| Administration, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

## AMENDED REPORT AND RECOMMENDATION
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Kenneth E. Davis seeks judicial review of a final decision of the Acting Commissioner of the Social Security Administration ("the Commissioner") denying his application for Social Security disability insurance benefits. Judge Atlas referred this case for all purposes pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). ECF No. 14. Currently pending are cross motions for summary judgment. ECF Nos. 11 & 13. The Court recommends that Plaintiff's motion be denied and the Commissioner's motion be granted.[1]

---

[1] The Court withdraws its Report and Recommendation issued on November 9, 2017.

# I.    BACKGROUND

## A. Procedural Background

On June 24, 2013, Plaintiff applied for disability insurance benefits under Title II of the Social Security Act ("the Act"). R. 177-78.[2] The Social Security Administration ("SSA") denied his application initially and upon reconsideration.

Pursuant to Plaintiff's request, a hearing was scheduled before Administrative Law Judge Thomas G. Norman ("the ALJ") on January 22, 2015. At that hearing, Plaintiff's counsel asserted for the first time that Plaintiff was making a claim for psychological impairment in addition to his physical impairment. R. 75. Because the medical record was limited, the ALJ suggested that they postpone the hearing so he could order psychiatric and orthopedic consultative examinations. R. 76-79. The Plaintiff agreed. *Id.* The next hearing was held on May 28, 2015. R. 44. Plaintiff, his wife and a vocational expert testified at the hearing. R. 44-74.

On July 14, 2015, the ALJ issued an unfavorable decision, concluding that Plaintiff was not disabled during the relevant period and, therefore, was not entitled to the benefits for which he applied. R. 24-43. Plaintiff appealed the ALJ's decision to the SSA's Appeals Council. On November 29, 2016, the Appeals Council denied Plaintiff's request for review. R. 1-6.

---

[2] "R." citations are to the electronically-filed record, ECF No. 8.

On February 16, 2017, Plaintiff filed a *pro se* complaint in this case, seeking judicial review of the Commissioner's denial of his Title II claim for benefits on the basis that the Commissioner's decision was "not supported by substantial evidence." ECF No. 1. Plaintiff asserted that there was a hearing on May 28, 2015. He further alleged that because there was not enough evidence, the ALJ ordered two consulting evaluations, psychological and orthopedic. *Id.* He further alleged that the ALJ denied his claim six months later. *Id.*

On July 28, 2017, Plaintiff filed a dispositive motion requesting that the Court "change the decision of the Administrative Law Judge . . . to disabled." ECF No. 11. Plaintiff's supporting affidavit challenges his age classification and his skill level. On August 28, 2017, the Commissioner filed a cross motion for summary judgment. ECF No. 13.

## B. Factual Background

Plaintiff asserts that he suffers from both physical and mental disabilities. In his application for disability benefits, Plaintiff stated that he had been disabled since June 21, 2012. R. 177-78.

### 1.  Plaintiff's Work History

Plaintiff was born on February 6, 1966. R. 48. He testified that he finished the twelfth grade in high school. *Id.*

Plaintiff has held many jobs, all of which can be characterized as manual labor. Plaintiff testified that he always worked the night shift because he and his wife "had five children and [his] wife would work in the daytime and then [he] would work at night." R. 49-50. Plaintiff testified that he most recently worked at Dr. Pepper for six weeks, although he did not list this job on his work history report. R. 49. He had "tried to go back to work [but] he just could not do it." R. 47.

Between November 2009 and October 2011, Plaintiff worked as a night stocker at Kroger. R. 193. Between June 2008 and December 2008, Plaintiff worked as a housekeeper at Cy-Fair Hospital. R. 193. Between August 2007 and February 2008, Plaintiff worked as a night stocker at HEB. R. 193. Between October 2006 and November 2006, Plaintiff worked as an assembler at a warehouse for Venturi Staffing. R. 193. Between September 2005 and October 2006, Plaintiff worked installing insulation at Bison Building Materials. R. 193. Between June 2002 and December 2002, Plaintiff worked as a night stocker at Sam's Club. R. 51, 193, 207, 208.

## 2. Plaintiff's Medical History

In 2002, after an accident at work, Plaintiff injured his back. He was "lifting turkeys and felt a sharp pain."[3] Following this accident, Plaintiff went to the emergency room. He was able to return to work after the accident. R. 269.

---

[3] At the time of this accident, Plaintiff was working at Sam's Club.

In 2006, Plaintiff suffered further injuries when he "fell off a ladder" at work. *Id*. He visited Memorial Hermann The Woodlands Medical Center, where he reported that he "fell from [a] seven foot height" and "land[ed] on [his] feet." Plaintiff, who arrived at the hospital in a wheelchair, reported experiencing back pain and numbness in his toes. R. 299. Plaintiff was given pain and anti-anxiety medication. R. 299-300, 306. A series of X-rays revealed that Plaintiff's lumbar spine was "unremarkable." R. 316-17.[4] An additional series of X-rays of Plaintiff's feet showed the presence of "tiny bone spurs…in the dorsal aspects of the calcaneus." R. 319.[5] The following day, on September 23, 2006, Dr. Walid Khalid Adham, M.D. ("Dr. Adham") performed a CT scan of Plaintiff's lumbar spine. The CT scan showed "normal alignment of the lumbar spine without fractures or spondylolisthesis,"[6] "no significant disc bulges or herniations,"[7] and "no spinal or neuroforaminal stenosis"[8] at T12-L1, L1-L2, and L2-L3. The CT scan also showed "degenerative changes within the lumbar spine." R. 314. Plaintiff subsequently

---

[4] In this context, "unremarkable" indicates that Plaintiff's lumbar spine appeared normal.

[5] The calcaneus is the heel bone. The dorsal part of the calcaneus attaches the heel bone to the Achilles tendon.

[6] Spondylolisthesis refers to a spinal disorder in which one vertebra slips forward onto the vertebra below it.

[7] Herniation, which most often occurs in the lumbar spine and is commonly called a slipped disc, occurs when a tear in the outer ring of an intervertebral disc allows the soft, central portion of the disc to bulge out.

[8] Neuroforaminal stenosis refers to the compression of the foramina, or open spaces between the vertebrae.

completed a course of physical therapy. R. 269. After this accident, Plaintiff returned to work.

Plaintiff did not seek further medical treatment for his back pain until six years later. On June 23, 2012, Dr. Ghada Saqer, M.D. ("Dr. Saqer") examined Plaintiff. Dr. Saqer ordered an MRI, without contrast, of Plaintiff's lumbar spine. Dr. Alan Lobo, M.D. ("Dr. Lobo"), performed the MRI, which revealed "straightening of the normal lumbar lordosis," a possible indicator of "underlying muscle spasm," "minimal type II fatty endplate marrow changes . . . at the anterior L2-L3 endplates," "disc desiccation . . . at the L3-L4, L4-L5 and L5-S1 levels," and "annular tear and disc protrusions . . . at the L5-S1 level." R. 218.[9]

After that visit, Plaintiff did not seek treatment for his back for another two years. On March 4, 2014, Dr. Monica A. Wu, M.D. ("Dr. Wu"), a family practice physician, treated Plaintiff for back pain at Harris Health. Plaintiff reported that he was not currently taking medication. R. 286-87. Dr. Wu gave Plaintiff new prescriptions. She gave Plaintiff referrals for a neurosurgery consultation, psychotherapy, and psychiatry. R. 287-88.

---

[9] Lordosis refers to spinal curvature. A finding of straightening of the normal lumbar lordosis means that the curvature of Plaintiff's spine had become flattened. "Type II fatty endplate marrow changes" indicates that the bone has been replaced by fatty yellow marrow. Disc desiccation, or dehydration, is an early degenerative indicator. An annular tear occurs when the exterior of an intervertebral disc rips or tears.

Four months later, on July 10, 2014, Dr. Wu again treated Plaintiff for back pain. Dr. Wu diagnosed Plaintiff with a "bulge [of the] cervical disc without myelopathy," "foraminal stenosis of [the] lumbar region," and "back muscle spasm." R. 280.[10] Dr. Wu characterized Plaintiff's back pain as "unresponsive to routine treatment," although Plaintiff reported "a difference in his back pain since he [had] lost weight [25 pounds]." Even so, Plaintiff's back still "hurt with certain movements such as bending forward" and was "even worse" when he bent backwards. R. 283. Plaintiff displayed a "normal range of motion," although he reported experiencing musculoskeletal tenderness. R. 284. Dr. Wu referred Plaintiff to physical therapy and prescribed Baclofen (a muscle relaxant). *Id*.

Two weeks later, on July 24, 2014, Plaintiff returned to Dr. Saqer, who had examined him in 2012. Plaintiff complained of "back pain radiat[ing] to the right buttock area and the righ[t] leg." He reported "painful joints," low back pain, and "tingling/numbness." R. 322. Dr. Saqer, who had ordered an MRI of Plaintiff's lumbar spine prior to his appointment, diagnosed Plaintiff with an "unspecified disc disorder of the lumbar region," including "lumbar disc disease at level L3-L4, L4-L5, [and] L5-S1, with radiculopathy more on the right side due to

---

[10] Cervical discs are those disc found in the cervical spine, or neck. Myelopathy refers to a nervous system disorder, often the result of a sudden injury or natural degeneration of the spine, affecting the spinal cord.

neuroforaminal narrowing." R. 323.[11] Dr. Saqer advised Plaintiff to exercise and lose weight. *Id*.

On August 18, 2014, on the referral of Dr. Wu, Plaintiff visited Dr. Ruben Mendez, M.D. ("Dr. Mendez"), a psychiatrist at Harris Health. Plaintiff reported to Dr. Mendez that he felt "depressed and down" and reported a "loss of interest in his usual activities." Plaintiff also reported hearing a "faint voice in his head." R. 278. Dr. Mendez, who observed that Plaintiff was experiencing "mild auditory hallucinations," diagnosed Plaintiff with an anxiety disorder. R. 276, 278. He prescribed an antidepressant. R. 276-77. On March 24, 2015, Plaintiff returned for a follow up visit with Dr. Mendez. Plaintiff reported feeling "more depressed" and told Dr. Mendez that he had "stopped doing enjoyable things with his family." R. 366. Plaintiff told Dr. Mendez that he had discontinued taking his medicine since his last visit because "he felt he did not need to take anything for his mind." R. 366. Dr. Mendez prescribed a new regime of drugs to Plaintiff. R. 364.

On March 25, 2015, Patricia P. Dean, N.P. ("Ms. Dean") saw Plaintiff for a follow up visit at Harris Health. Plaintiff reported experiencing back pain and spasms after a recent motor vehicle accident. Ms. Dean, who noted that Plaintiff was a regular patient of Dr. Wu, refilled Plaintiff's existing prescriptions. R. 357-60.

---

[11] Radiculopathy refers to the presence of a compressed nerve in the spine.

### 3.  Assessments of Plaintiff's Physical and Mental Impairments

In advance of the hearing, at the request and expense of DARS, three medical experts examined Plaintiff. On August 22, 2013, Dr. Rosalyn B. Beaty, M.D., M.P.H. ("Dr. Beaty) conducted an internal medicine consultative examination of Plaintiff. During the examination, Plaintiff complained of "pain in his low back." R. 269. He reported that his back pain was caused by "prolonged sitting and standing," as well as "walking and bending," and "aggravated" by "sitting, standing, pushing, pulling, walking, stooping, bending, reaching and weather changes." *Id*. Plaintiff reported that he used "heat or ice, stretching and Motrin" to alleviate his pain. *Id*. Dr. Beaty, who noted that Plaintiff was "in no apparent distress," observed "no costovertebral tenderness" or spasms.[12] R. 271. Plaintiff had an "antalgic gait, favoring the right side,"[13] was "able to sit and stand without difficulty, and did not display any "joint deformity, bone and tissue destruction, tenderness, crepitus, heat, redness, or effusion."[14] R. 272. He had normal strength in his upper extremities, lower extremities, and grip. Plaintiff was "able to perform heel and toe walking and tandem walking," although he reported "back pain with toe walking." *Id*. Plaintiff's pain precluded him from squatting.

---

[12] Costovertebral tenderness refers to pain in a region of the lower back adjacent to the spine. It can indicate kidney problems.

[13] An antalgic gait is a gait abnormality that develops as a way to avoid pain while walking.

[14] In this context, crepitus refers to a grinding or grating sound produced by joint movement. Effusion refers to an abnormal buildup of joint fluid.

Dr. Beaty ordered X-rays of Plaintiff's lumbar spine. Dr. David J. Wolk, M.D. ("Dr. Wolk"), performed the X-rays, which revealed "marginal vertebral body osteophytes arising throughout the lumbar spine particularly on the left side [at the] L1-L2 level."[15] R. 273. Dr. Wolk did not find evidence of any "acute abnormalities." *Id*.

On September 25, 2013, Dr. Leigh McCary, M.D. ("Dr. McCary"), a non-examining consultative physician, reviewed Plaintiff's medical records. Dr. McCary, who described Plaintiff as only "partially credible," R. 83, assessed that Plaintiff was able to sit and stand without difficulty. R. 82. After reviewing notes from Dr. Beaty's examination of Plaintiff, Dr. McCary concluded that Plaintiff could stand or walk for four hours and sit for "about 6 hours in an 8-hour workday." R. 84. Plaintiff could "occasionally" climb ramps or stairs, climb ladders, balance, stoop, kneel, crouch, and crawl. *Id*. According to Dr. McCary, Plaintiff could engage in "sedentary" work and was not disabled. R. 86.[16]

On January 9, 2014, Dr. Betty Santiago, M.D. ("Dr. Santiago), a non-examining consultative physician, reviewed Plaintiff's medical records. Dr. Santiago, who described Plaintiff as "not wholly credible" in describing the severity of his pain, R. 93, determined that Plaintiff could occasionally lift twenty

---

[15] Marginal osteophytes refers to small bone spurs.

[16] Although Dr. McCary determined that Plaintiff could perform "sedentary work," she nevertheless noted that Plaintiff's RFC, which limited him to standing and walking for four hours per day, could potentially put him "into the restricted light category." R. 86.

pounds, frequently lift ten pounds, stand or walk for four hours per day, and sit for "about six hours in an 8-hour workday." R. 94. Plaintiff could "occasionally" climb ramps or stairs, climb ladders, balance, stoop, kneel, crouch, and crawl. R. 94-95. Dr. Santiago concluded that Plaintiff could engage in "light" work and was not disabled. R. 96-97.

On March 3, 2015, Dr. Frank L. Barnes, M.D. ("Dr. Barnes"), an orthopedic surgeon, conducted a consultative examination of Plaintiff. Plaintiff's chief complaint was "right leg tingling and numbness." R. 331. He also complained of "intermittent, sharp and burning" back pain that was "increased by walking, sitting, or bending" but "diminished by lying down and applying ice or heat." *Id*. Plaintiff was "reluctant" to have back surgery.[17] *Id*. Plaintiff told Dr. Barnes that his legs sometimes "[gave] way," causing him to "lose his balance." R. 332. Plaintiff reported that he was able to "walk less than a block," sit for fifteen minutes, lift four pounds, and stand for ten minutes. *Id*. He also reported that he spent 16 out of 24 hours per day in bed. *Id*. Dr. Barnes assessed that Plaintiff had a "very limited" range of motion in his lumbar spine, was "tender to very light touch over the entire lumbar area and the right gluteal area," and had "palpable spasm bilaterally." *Id*. Dr. Barnes added that "light touch sensory testing show[ed] hypoesthesia of the

---

[17] Plaintiff testified that his physicians had not formally recommended back surgery. They were still exploring the possibility of performing back surgery as a treatment for Plaintiff's back pain, and they planned to conduct an additional MRI to assist in this determination. R. 60.

left distal thigh anteriorly, the left lateral calf and the lateral foot."[18] However, Plaintiff had "normal strength" in his hips, knees, and ankles. *Id.* Dr. Barnes ordered an X-ray of Plaintiff's lumbar spine, revealing "left side bridging of L1-L2" and "narrowing and osteophytes from L3 to S1." R. 334. Dr. Barnes diagnosed Plaintiff with lumbar osteoarthritis. R. 333.[19]

Dr. Barnes' assessment of Plaintiff's physical limitations differed considerably from the assessments of Dr. McCary and Dr. Santiago. He determined that Plaintiff could frequently lift and carry up to ten pounds, although he could never lift or carry more than ten pounds. R. 337. Plaintiff could sit for one hour without a break and stand and walk for thirty minutes without a break. In an eight hour workday, Plaintiff could sit for four hours and stand and walk for one hour each. Dr. Barnes did not specify how Plaintiff would spend the remaining two hours, thus limiting Plaintiff to a six hour workday. Dr. Barnes indicated that Plaintiff did not require the use of a cane to walk. R. 338. Plaintiff could occasionally perform overhead reaching and continuously perform reaching (excluding overhead reaching), handling, fingering, feeling, pushing, and pulling. R. 339. Plaintiff could never climb ladders or scaffolds or perform balancing, but he could occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl.

---

[18] Hypoesthesia refers to a reduced sense of touch or sensation. It is colloquially referred to as numbness.

[19] Lumbar osteoarthritis refers to a form of degenerative arthritis in the low back.

R. 340. Dr. Barnes assessed that Plaintiff could never tolerate exposure to unprotected heights, moving mechanical parts, or vibrations; could occasionally operate a motor vehicle and tolerate exposure to humidity, wetness, and extreme heat; and could continuously tolerate exposure to dust, odors, fumes, pulmonary irritants, and extreme cold. R. 341. Based on Plaintiff's physical impairments, he could go shopping, travel without a companion for assistance, walk without using an assistive device, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed himself, care for his personal hygiene, and sort, hand, and use paper and files. R. 342.

On March 2, 2015, Dr. Teresa Leah Tarver, Psy.D. ("Dr. Tarver") conducted a consultative psychological examination of Plaintiff. Plaintiff was "appropriately dressed" and exhibited "clearly articulated, goal directed speech." R. 348. He appeared to be "depressed, and mildly anxious," although he was "oriented," demonstrated "adequate insight," displayed an "adequate fund of knowledge," and engaged in "abstract, linear thinking." *Id*. Plaintiff reported that he began having panic attacks after losing his job. R. 345. Plaintiff reported experiencing "anger/temper problems, anxiety, depression, learning problems, obsessive-compulsive behaviors, and psychoses." *Id*. He also reported a history of suicidal ideation, although he indicated that he had no real intent to commit suicide. R. 346.

Dr. Tarver administered the Weschler Adult Intelligence Scale, Fourth Edition ("WAIS-IV") to Plaintiff. From these tests and her examination of Plaintiff, Dr. Tarver concluded that Plaintiff was "not…impaired in his ability to reason," although he had "some impairment in his ability to make occupational, personal, and social adjustments." R. 349. In particular, Plaintiff was not impaired in his ability to understand and remember simple instructions and carry out simple instructions. Dr. Tarver assessed Plaintiff as having a "mild" restriction in his ability to make judgments on simple work-related decisions. R. 350. She further assessed Plaintiff as suffering from a "marked" restriction of his ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. *Id*. Plaintiff was mildly restricted in his ability to interact appropriately with co-workers; moderately restricted in his ability to interact appropriately with the public and respond appropriately to usual work situations and to changes in a routine work setting; and markedly restricted in his ability to interact appropriately with supervisors. R. 351.

Dr. Tarver suggested that with medication and therapy, Plaintiff's existing impairments would "significantly decrease." R. 349. She gave Plaintiff provisional diagnoses of "major depressive disorder, single episode, severe, with psychotic features," and a mild intellectual disability. *Id*.

14

### 4. Plaintiff's Testimony

At the hearing, Plaintiff testified that "just his back" prevented him from working.[20] R. 52. Because of his back pain, Plaintiff spent "approximately about 12 to 14 hours a day" either sitting or lying down. Plaintiff testified that he was "not able to even do the things [he] used to do." *Id.* Plaintiff's wife similarly testified that Plaintiff "trie[d] to help as much as possible," but "struggle[ed] when it comes to the pain in his back." R. 61.

## II.   LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks and citation omitted). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Quality InfusionCare, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 728 (5th Cir. 2010) (internal quotation marks and citation omitted).

---

[20] However, Plaintiff testified that he took Sertraline (Zoloft) for his depression, along with a "whole bunch of [other] medicine." He testified that his depression began after he was wrongfully terminated from his job at Kroger. He had sued Kroger, and the ongoing case worried him. Before his termination, Plaintiff had not taken any medication for depression. R. 54-58.

### B. Standard of Review

The Act provides that an individual may seek judicial review of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party." 42 U.S.C. § 405(g). In performing that review:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing. The findings of the Commission . . . as to any facts, if supported by substantial evidence, shall be conclusive . . . .

*Id.*

Judicial review of the Commissioner's denial of disability benefits is limited to two inquiries: first, whether the decision is supported by substantial evidence; and second, whether the Commissioner applied the proper legal standards in evaluating the evidence. *See id.* ("The findings of the Commissioner . . . as to any facts, if supported by substantial evidence, shall be conclusive . . . "); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). "Substantial evidence" means "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." *Id.*

A reviewing court may not reweigh the evidence in the record, retry the issues *de novo*, or substitute its judgment for that of the Commissioner, even if the evidence preponderates against the Commissioner's decision. *Brown v. Apfel*, 192

F.3d 492, 496 (5th Cir. 1999). Conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Id.* At the same time, however, judicial review must not be "so obsequious as to be meaningless." *Id.* (internal quotation marks and citation omitted). The "substantial evidence" standard is not a rubber stamp of the Commissioner's decision. It involves more than a search for evidence supporting the Commissioner's findings. *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985); *Singletary v. Brown*, 798 F.2d 818, 822–223 (5th Cir. 1986) ("[T]he substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the [Commissioner's] decision."). Rather, a reviewing court must scrutinize the record as a whole, taking into account whatever in the record fairly detracts from the weight of the evidence supporting the Commissioner's findings. *See Cook*, 750 F.2d at 393. A court "may affirm only on the grounds that the Commissioner stated for [the] decision." *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014).

## III.   THE ALJ'S DISABILITY DETERMINATION

An individual claiming entitlement to disability insurance benefits must demonstrate that he is "disabled" under the Act. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). A claimant is disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); *see also Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999). "Substantial gainful activity" refers to work involving "significant physical or mental activities" done "for pay or profit." 20 C.F.R. § 404.1572(a)-(b).

The Commissioner employs a five-step sequential inquiry in determining a claimant's disability status:

(1) Is the claimant presently engaged in "substantial gainful activity"? (Step One)

(2) Does the claimant have a "severe" impairment or combination of impairments? (Step Two)

(3) Are the claimant's impairments of a severity that meets or equals that of an impairment listed in Appendix 1 of the Regulations? (Step Three)

(4) Can the claimant perform his past relevant work? (Step Four)

(5) Do the claimant's impairments prevent him from performing other substantial gainful activity? (Step Five)

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a). Before proceeding from Step Three to Step Four, the Commissioner must assess a claimant's residual functional capacity ("RFC") based on "all the relevant medical and other evidence" in the record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is the most he

can still do despite his physical or mental limitations. *Id.* §§ 404.1545(a)(1); 416.945(a)(1).

On the first four steps of this inquiry, the claimant bears the burden of proving that a disability exists. *Perez*, 415 F.3d at 462. If the claimant successfully carries this burden, the burden shifts to the Commissioner, at Step Five, to show that the claimant can perform other work in the national economy. If the Commissioner shows that other work is available to the claimant, the burden shifts back to the claimant, who must rebut the Commissioner's finding. *Id*. If, at any point in this inquiry, the Commissioner finds that the claimant is disabled or not disabled, that determination is conclusive and terminates the analysis. *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001).

Here, the ALJ found at Step One that Plaintiff had not engaged in substantial gainful activity since June 21, 2012, the alleged onset date of his disability. R. 29. At Step Two, the ALJ found that Plaintiff had the following severe impairments: obesity, osteoarthritis of the lumbar spine, depression, and cognitive anxiety disorder. R. 30. At Step Three, however, the ALJ concluded that Plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id*.

Before proceeding to Steps Four and Five, the ALJ assessed Plaintiff's RFC. He found that Plaintiff had the RFC required to perform "sedentary work," although he was subject to a number of additional exertional and non-exertional limitations. R. 32. Specifically, Plaintiff was limited to "occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs," "occasional bilateral overhead reaching," and "occasional operation of foot control bilaterally." *Id*. He could never perform work involving "unprotected heights, moving or dangerous machinery, and vibrations." *Id*. Plaintiff was required to work indoors. Moreover, Plaintiff could only work if he was "essentially isolated, with only occasional supervision, no more than occasional contact with coworkers, and no contact with the general public." *Id*.

Based on this assessment of Plaintiff's RFC, the ALJ found, at Step Four, that Plaintiff was unable to perform his past relevant work. R. 38-39. At Step Five, the ALJ applied the Grid Rules for a younger individual with a high school education and the ability to perform sedentary work. The Grid Rules provide that in such instances, the claimant is not disabled. Therefore, the ALJ concluded that Plaintiff could perform "jobs that exist in significant numbers in the national economy." R. 39. In particular, a vocational expert testified that Plaintiff could work as a document specialist, a contact lens finisher, or a surveillance monitor. R. 69-70. Therefore, the ALJ concluded that Plaintiff was not disabled.

## IV.   THE ALJ APPROPIATELY APPLIED THE GRID RULES

As an administrative factfinder, the ALJ is entitled to significant deference in deciding the appropriate weight to accord the evidence in the record. *See Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). In reviewing the decision of the ALJ on cross-motions for summary judgment, the Court limits its inquiry to those issues the parties briefed. *See Fontenot v. Colvin*, 661 F.Appx 274, 277 (5th Cir. 2016) (per curiam). However, because Plaintiff appears *pro se,* his papers must be liberally construed and interpreted as raising the strongest arguments that they suggest. *Cairo v. Comm'r,* No. 15-cv-5171, 2017 WL 1047329 (E.D.N.Y. 2017); *Tefera v. Colvin,* 61 F. Supp. 3d 207, 214 (D. Ma. 2014); *Miller v. Comm'r,* 504 F. Supp. 2d 433, 437 (W.D.N.Y. 2008).

In this case, even interpreting his motion to raise the strongest arguments, Plaintiff raises only one issue: the ALJ's application of the Medical-Vocational Guidelines ("Grid Rules"). The Commissioner asserts that Plaintiff did not meet any Grid Rule applicable to his age during the relevant period. ECF No. 13-1at 6-9. The Court finds that the Plaintiff's argument is without merit.

The Grid Rules "allow the Commissioner to take 'administrative notice' of the availability of jobs that exist in the national economy that can be performed by individuals at various function levels." *Fosha v. Barnhart*, 372 F.Supp.2d 948, 954 (S.D. Tex. 2005). At Step Five, the ALJ may "rely exclusively on" the Grid Rules

to determine whether the claimant can perform other work in the national economy. *Id*.

Plaintiff contends that the ALJ should have applied the Grid Rules for an individual who was "closely approaching advanced age." Plaintiff explains that at the time of his appeal, he had turned 51 years old. ECF No. 11-2 at 1. Based on his age at the time of his appeal, his "limited" educational background, and the fact that his previous work experience had been "unskilled," Plaintiff contends that the ALJ should have found him to be disabled under the Grid Rules. *Id*.

Even though Plaintiff was "closely approaching advanced age" at the time he filed his appeal, this fact does not suggest that the ALJ incorrectly applied the Grid Rules. For the purposes of determining disability, the relevant inquiry concerns the age of the claimant at the hearing before the ALJ, not the age of the claimant at the time an appeal is filed. *Grant v. Shalala*, 33 F.3d 1379, 1994 WL 487172, at *5 (5th Cir. 1994) (finding that the court's "review [was] limited . . . to whether [the claimant] was disabled at the time of the hearing before the ALJ and from the date claimed as the onset of [the claimant's] disability"). Under the Grid Rules, an individual under the age of 50 is a "younger individual," while an individual between the ages of 50 and 54 is "closely approaching advanced age." 20 C.F.R. Pt. 404, Subpart P, App. 2, Table 1.

If an individual is "within a few days to a few months of reaching an older age category," the ALJ may opt to apply the older age category if doing so would "result in a determination or decision that [the claimant is] disabled." 20 C.F.R. § 404.1653(b). Agency guidelines provide that "a few months should mean a period not to exceed six months." *Hearing, Appeals, and Litigation Law Manual* (HALLEX), I-2-2-42, 2016 WL 1167001, at *1. At the time of the onset of Plaintiff's disability, Plaintiff was 46 years old. On the date of the ALJ's decision, Plaintiff was 49 years, five months, and eight days old. ECF No. 13-1 at 7. Because Plaintiff would not turn 50 for more than six months, he did not fall within a borderline age category and the ALJ had no duty to "consider whether to apply the older age category." 20 C.F.R. § 404.1653(b).

Plaintiff also claims that he did not have a high school diploma. ECF No. 11-2. However, Plaintiff testified that he finished the twelfth grade. R. 48. Plaintiff conceded in his affidavit that unskilled labor refers to jobs that requires no more than a high school diploma and could include high school a dropout. ECF No. 11-2. Therefore, this argument is without merit and contradicts the Plaintiff's testimony, which is the only evidence in the record on point.

Because Plaintiff did not fall within a borderline age category and had completed high school, the ALJ properly applied Grid Rule 201.21 for a younger individual between the ages of 45 and 49 with a high school education.

## V.    CONCLUSION

The Court **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED** and the Commissioner's motion for summary judgment be **GRANTED**.

The Parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *Ortiz v. San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).

Signed on January 3, 2018, at Houston, Texas.

_____
Dena Hanovice Palermo
United States Magistrate Judge